IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD BARNES, individually and on §
behalf of other similarly situated employees §
and former employees of Defendant, §
    Plaintiff(s), §
 §
vs. §       CIVIL ACTION NO. 4:12-cv-01399
 §              JURY
ABANDONMENT CONSULTING §
SERVICES, L.L.C., §
    Defendant. §

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT
ABANDONMENT CONSULTING SERVICES, LLC'S
MOTION FOR SUMMARY JUDGMENT**

_____

LAW OFFICE OF G. SCOTT FIDDLER, P.C.


**/s/ G. Scott Fiddler**
_____
G. SCOTT FIDDLER
SBOT #06957750
FID #12508
scott@fiddlerlaw.com
ANDREW W. REED
SBOT #24074935
FID #1140192
areed@fiddlerlaw.com
9601 Jones Road, Suite 250
Houston, Texas 77065
Tel.:   281-897-0070
Fax:   281-897-0078

ATTORNEYS-IN-CHARGE
FOR PLAINTIFF

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

I.      Introduction and Nature and Stage of the Proceedings.................................................1

II.     Issue to be Ruled Upon and Standard ........................................................................2

III.    Summary of the Argument.........................................................................................3

IV.     Factual Summary ....................................................................................................5

V.      Law and Analysis....................................................................................................7
        A.      Barnes was an Employee of Abandonment in Her Termination ...........................7
                1.      Degree of Control ...............................................................................8
                2.      Relative Investment .............................................................................13
                3.      Opportunity for Profit or Loss ..............................................................15
                4.      Skill and Initiative Required ................................................................17
                5.      Permanency for the Relationship ..........................................................20
                6.      Written Agreement..............................................................................21
                7.      Industry Custom.................................................................................22
        B.      Barnes is Owed for Overtime under the FLSA...............................................23

VI.     Conclusion ..........................................................................................................25

Prayer ................................................................................................................... 25

Certificate of Service ............................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) ............................................................. 3

*Auer v. Robbins*,
    519 U.S. 452, 117 S. Ct. 905 (1997) ............................................................. 24

*Baker v. Flint Eng'g & Constr. Co.*,
    137 F.3d 1436 (10th Cir. 1998) ............................................................. 19

*Brock v. Mr. W Fireworks, Inc.*,
    814 F.2d 1042 (5th Cir. 1987) ............................................................. 17, 21

*Carrell v. Sunland Const., Inc.*,
    998 F.2d 330 (5th Cir. 1991) ............................................................. 10, 13, 15

*Chapman v. A.S.U.I. Healthcare of Tex., Inc.*,
    No. H-11-3025, 2012 WL 3614187 (S.D. Tex. Aug. 21, 2012) ....................................... 11

*Genesis Healthcare Corp. v. Symczyk*,
    No. 11-1059, ___ S. Ct. ___, 2013 WL 1567370 (April 16, 2013) ................................. 21

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*,
    161 F.3d 299 (5th Cir. 1998) ............................................................. 19

*Hopkins v. Cornerstone Am.*,
    545 F.3d 338 (5th Cir. 2008) ................................... 7, 8, 9, 10, 11, 12, 13, 15, 17, 20, 21

*Karna v. BP Corp. N. Am., Inc.*,
    No. H-12-0101, 2013 WL 1155485
    (S.D. Tex. March 19, 2013) ........................................... 11, 12, 15, 17, 19, 20, 22

*Mack v. Talasek*,
    No. V-09-53, 2012 WL 1067398 (S.D. Tex. March 28, 2012) ....................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Ratio Corp.*,
    475 U.S. 574, 109 S. Ct. 1348 (1986) ............................................................. 2

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318, 112 S. Ct. 1344 (1992) ............................................................. 7

*Reich v. Priba Corp.*,
    890 F. Supp. 586 (N.D. Tex. 1995) ............................................................. 21

*Robicheaux v. Radcliff Material, Inc.*,
    697 F.2d 662 (5th Cir. 1983) ................................................................ 8

*Shultz v. Hinojosa*,
    432 F.2d 259 (5th Cir. 1970) .............................................................. 20

*Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*,
    321 U.S. 590, 64 S. Ct. 698 (1944) ................................................... 23

*Thibault v. Bellsouth Telecomms, Inc.*,
    612 F.3d 843 (5th Cir. 2010) ......................................................... 12, 13

*Tyler v. Union Oil Co. of California*,
    304 F.3d 379 (5th Cir. 2002) .............................................................. 24

*Zheng v. Liberty Apparel Co. Inc.*,
    355 F.3d 61 (2d Cir. 2003) .................................................................. 22

**Rules and Statutes**

29 C.F.R. § 541.602 ................................................................................... 24

29 C.F.R. § 778.112 ................................................................................... 24

29 U.S.C. § 203(d) ....................................................................................... 5

29 U.S.C. § 203(g) ....................................................................................... 5

29 U.S.C. § 207 .......................................................................................... 23

29 U.S.C. § 207(a)(1) .................................................................................. 5

29 U.S.C. § 213 .......................................................................................... 24

29 U.S.C. § 216(e)(1) ................................................................................... 7

29 U.S.C. § 216(g) ........................................................................................ 7

Fed. R. Civ. P. 56 ........................................................................................ 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD BARNES, individually and on | § | |
| behalf of other similarly situated employees | § | |
| and former employees of Defendant, | § | |
|     Plaintiff(s), | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:12-cv-01399 |
| | § | JURY |
| ABANDONMENT CONSULTING | § | |
| SERVICES, L.L.C., | § | |
|     Defendant. | § | |

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT
ABANDONMENT CONSULTING SERVICES, LLC'S
MOTION FOR SUMMARY JUDGMENT**

_____

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Richard Barnes ("Plaintiff" or "Barnes"), files this *Plaintiff's Response to Defendant Abandonment Consulting Services, LLC's Motion for Summary Judgment* and would show the following:

**I. INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS**

Barnes filed this Fair Labor Standards Act (the "FLSA") case on May 3, 2012. Barnes filed his *Complaint* as a collective action, individually and on behalf of other similarly situated assigned employees and workers and former assigned employees and workers of Abandonment Consulting Services, L.L.C. ("Abandonment") who might opt-in this lawsuit.[1]

On April 25, 2013, Barnes filed his *Motion for Conditional Certification and Notice to Potential Plaintiffs* seeking to have notice sent to all current and former employees and workers of Abandonment assigned as Rig Clerks who were paid a day-rate and not paid extra half-time

---
[1] Document 1.

overtime, so they might have the opportunity to join this lawsuit and have all their claims adjudicated efficiently in one lawsuit.[2]

The discovery deadline was April 5, 2013. The dispositive motion deadline was May 6, 2013. Trial is set for August 5, 2013.[3]

On May 7, 2013, Abandonment filed its *Defendant Abandonment Consulting Services, LLC's Motion for Summary Judgment*[4] and its *Brief in Support of Motion for Summary Judgment,*[5] ("MSJ") claiming there is no factual dispute and that Abandonment was not Barnes's employer under the economic realities test of the FLSA.[6]

## II. ISSUE TO BE RULED UPON AND STANDARD

The sole issue to be ruled upon by the Court is whether there is a genuine issue of material fact as to whether, as a matter of economic reality under the FLSA, Barnes was an employee of Abandonment, or whether Abandonment is entitled to judgment as a matter of law on the issue. FED. R. CIV. P. 56.

Summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The moving party has the burden of showing the absence of a genuine issue as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Ratio Corp.,* 475 U.S. 574, 586-87, 109 S. Ct. 1348, 1355-1356 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be

---

[2] Document 20.

[3] Document 9.

[4] Document 21. Abandonment's MSJ was untimely filed. As a courtesy to opposing counsel, Barnes agreed to not object to the motion as being untimely filed.

[5] Document 21-1.

[6] *See* Document 21-1, p. v. Barnes cites to page "v" because Abandonment's MSJ does not include the nature and stage of the proceedings, issues presented, or summary of the argument in the MSJ's numbered body. In addition to these pages, Abandonment's remaining twenty-six numbered pages appear to contain reduced font sizes and reduced borders. As such, Barnes is at a disadvantage in responding to what would otherwise be a thirty- to thirty-five-page motion, filed without leave of court.

drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). If reasonable minds can differ regarding a genuine issue of material fact, summary judgment should not be granted. *Anderson,* 477 U.S. at 250-51, 106 S. Ct. at 2513. A district court is not to weigh evidence and determine the truth of the matter but is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S. Ct. at 2510, 2511.

### III. SUMMARY OF THE ARGUMENT

Barnes has presented evidence that Abandonment misclassified Barnes as an independent contractor and that Barnes was, as an economic reality, an employee of Abandonment for the purposes of the FLSA.

Barnes did not exert control over a meaningful part of the business such that he should be viewed as a separate economic entity. Abandonment controlled the meaningful aspects of its business model in that Abandonment exercised control over the placement of workers, control over the assigning of leads, control over the location of assignments, Abandonment did not negotiate the day-rate paid to Barnes, and Abandonment provided a well-site supervisor who supervised Barnes and controlled Barnes's work schedule and the method and manner in which Barnes worked. Abandonment's agreement with its customer, Apache Corporation ("Apache"), stated Barnes would not be subject to the control or direction of Apache as to the details of work.

Barnes made almost no investment relative to that of Abandonment. Barnes did not supply his own office, desk, chairs, supplies, or equipment. The travel costs, if any, of Barnes are not considered in analyzing the "relative investment" factor, and even if considered, the evidence shows Barnes was reimbursed for much of this cost. Barnes did not acquire or maintain any health and liability insurance. Abandonment's agreement with Apache required Abandonment to

maintain no fewer than six forms of insurance. Abandonment also maintained a corporate office and accounting and payroll departments.

Barnes had no control over the amount of profits he could make. Barnes was not able to hire assistants, was not able to assign his duties, and Abandonment made the decisions regarding the amount, frequency, and method by which Barnes was paid. Barnes could not reduce the cost of performing his services as a Rig Clerk and thus net himself additional profits. Barnes was subject to a minimal risk of loss, if any at all. Though not required to make such a showing, the schedule worked by Barnes as a Rig Clerk precluded accepting additional jobs.

The position of Rig Clerk was essentially clerical, and did not require a unique skill set or an ability to exercise significant initiative within the business. The skills required for the Rig Clerk position, if any, consisted of routine work, and any special skills were not exercised in an independent way.

The position of Rig Clerk is of relative permanence as the jobs being performed are integral to Abandonment's business, and are performed as a matter of course on offshore rigs. Abandonment experiences little turnover within its business.

Barnes's subjective beliefs do not alter the economic realities of the employment relationship between Barnes and Abandonment. Any subjective beliefs or contractual arrangements are relevant only to the extent they reflect the economic realities of the situation.

The industry custom of employers requiring would-be employees to sign independent contractor agreements as a condition of employment to avoid compliance with the FLSA should not be considered as a justification for continuing and systemic violations of the FLSA.

Abandonment paid Barnes a day-rate. The day-rate paid to Barnes does not meet the salary basis test of the FLSA, and therefore Barnes is not exempt from the FLSA.

## IV. FACTUAL SUMMARY

Abandonment provides its customers in the oil and gas industry with workers to aid in the plugging and abandonment of oil and gas wells.[7] Generally, an Abandonment sales representative engages potential customers and, after being informed of an upcoming job, collects résumés from online sources or via referrals and recommends workers to customers for assignment.[8] Barnes was hired by Abandonment and assigned as a Rig Clerk in July 2011.[9]

Abandonment classified Barnes as an independent contractor instead of an employee.[10] By classifying Barnes as an independent contractor, Abandonment and its customers avoid paying payroll taxes for the work performed by Barnes, pushing the extra cost to Barnes. Also, by classifying Barnes as an independent contractor, Abandonment avoids paying Barnes an overtime premium as required by the FLSA.[11] Instead, Abandonment paid Barnes a day-rate.[12] Abandonment determined what it would pay Barnes based on the day-rate the Abandonment customer was willing to pay for the worker.[13] Abandonment pays the worker eighty percent of the amount paid to Abandonment by the customer.[14]

---

[7] *See* Document 21-4, p.1, ¶ 2.
[8] *See* Exhibit 1, Price Dep., pp. 60-61. "Exhibit 1, Price Dep., p. [#]" shall refer to the page number of the deposition of Carroll Price, attached hereto as Exhibit 1.
[9] *See* Exhibit 1, Price Dep., p. 76; Exhibit 2, p. 1, ¶ 2. "Exhibit 2, Barnes Dec., p. [#], ¶ [#]" shall refer to the page and paragraph number of the Declaration of Richard Barnes, attached hereto as Exhibit 2.
[10] *See* Exhibit 1, Price Dep., pp. 14, 18; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[11] *See* 29 U.S.C. §§ 203(d), (g), 207(a)(1).
[12] *See* Exhibit 1, Price Dep, pp. 28-29; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[13] *See* Exhibit 1, Price Dep., pp. 27-28.
[14] *See* Exhibit 1, Price Dep., p. 28.

Notwithstanding Abandonment's attempt to classify Barnes as an independent contractor, Abandonment exercised significant control over Barnes. For example, Barnes was not given the option to be treated as an employee,[15] was not free to assign or delegate his job duties,[16] was supervised by a well-site supervisor placed by Abandonment,[17] and was required to create and maintain files, working papers, and records related to his job duties.[18] Further, Abandonment had the authority to terminate the working relationship with Barnes,[19] made the decision regarding which customer Barnes would be assigned to,[20] made the decision regarding the amount Barnes would be paid,[21] made the decision regarding how often Barnes would be paid,[22] made the decision as to the method by which Barnes would be paid,[23] required Barnes to submit his time sheets to Abandonment twice per month,[24] and was responsible for paying Barnes.[25] Moreover, after being assigned by Abandonment, Barnes was not allowed to work for any other offshore companies,[26] and had to seek approval to leave the assigned worksite.[27] As a part of the exercise of its extensive control, Abandonment required Barnes be paid a day-rate.[28]

---

[15] *See* Exhibit 1, Price Dep., p. 21; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[16] *See* Exhibit 1, Price Dep., pp. 23-24, 83; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[17] *See* Exhibit 1, Price Dep., p. 18; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[18] *See* Exhibit 1, Price Dep., p. 80; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[19] *See* Exhibit 1, Price Dep., p. 27; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[20] *See* Exhibit 1, Price Dep., p. 27; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[21] *See* Exhibit 1, Price Dep., p. 28; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[22] *See* Exhibit 1, Price Dep., p. 28; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[23] *See* Exhibit 1, Price Dep., pp. 28-29; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[24] *See* Exhibit 1, Price Dep., pp. 60, 77; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[25] *See* Exhibit 1, Price Dep., pp. 59-60; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[26] *See* Exhibit 1, Price Dep., p. 82; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[27] *See* Exhibit 1, Price Dep., p. 62; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[28] *See* Exhibit 1, Price Dep., pp. 28-29, 47; Exhibit 2, Barnes Dec., p. 1, ¶ 3.

In addition to the control Abandonment exercised over Barnes, Barnes did not have the opportunity to control the degree of profit or loss available to him[29] and did not use his own tools or equipment.[30] The position of Rig Clerk, held by Barnes, was essentially a clerical position, which did not require extensive skills.[31] Barnes was, as an economic reality, dependent on Abandonment. *See Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself.").

## V. LAW AND ANALYSIS

### A.    Barnes was an Employee of Abandonment

The definition of employee under the FLSA is "particularly broad." *Hopkins*, 545 F.3d at 343 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344 (1992) (noting the FLSA "stretches the meaning of 'employee'")). An "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 216(e)(1). To "employ" is defined as including "to suffer or permit to work." 29 U.S.C. § 216(g).

The Fifth Circuit uses the "economic realities" test to determine whether the alleged employee is, as a matter of economic reality, economically dependent upon the business to which he renders his services, *i.e.*, whether the individual is in business for himself. *Hopkins*, 545 F.3d at 343. To assist in making this determination, the Fifth Circuit employs a test consisting of the following five factors: 1) the degree of control exercised by the alleged employer; 2) the extent of the relative investments of the worker and alleged employer; 3) the degree to which the

---

[29] *See* Exhibit 1, Price Dep., pp. 35-36; Exhibit 2, Barnes Dec., p. 2, ¶ 4.
[30] *See* Exhibit 1, Price Dep., pp. 37-38; Exhibit 2, Barnes Dec., p. 2, ¶ 4.
[31] *See* Exhibit 1, Price Dep., pp. 44-45 ("It's a clerical position, the majority of it."); Exhibit 2, Barnes Dec., p. 2, ¶ 5.

worker's opportunity for profit and loss is determined by the alleged employer; 4) the skill and initiative required in performing the job; and 5) the permanency of the relationship. *Id.* No single factor is determinative. *Id.* Rather, each factor is to be used to "gauge the *economic dependence*" of the putative employee, and each factor must be viewed with this in mind. *Id.* (emphasis in original).

      1.    <u>Degree of Control</u>

The first factor considered is the degree to which an individual exerts such a control over a meaningful part of the business that he stands as a separate economic entity. *See Hopkins*, 545 F.3d at 343. "Control" in this context refers to whether the plaintiff possesses "real independence" in the economic relationship. *Id.* Abandonment maintains in its MSJ that "[Abandonment] exercised no control of Barnes or the other allegedly similarly situated Rig Clerks."[32] In turn, Abandonment breaks apart the various areas of control Abandonment exercised over Barnes, analyzes it in isolation, and argues that it, standing alone, is insufficient to support a finding of control.[33] However, the determination of employee status requires an analysis of the evidence as a whole. *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983). Accordingly, it is not proper for Abandonment to say this factor or that factor, standing alone, is insufficient, in lieu of viewing the evidence as a whole.

The evidence viewed as a whole, shows Abandonment exercised significant control over Barnes. Abandonment did not give Barnes the option to be treated as an employee at the time of their hire.[34] Abandonment did not permit Barnes to assign or delegate his job duties.[35]

---

[32] *See* Document 21-1, p. vi.
[33] *See* Document 21-1, pp. 13-17.
[34] *See* Exhibit 1, Price Dep., p. 21; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[35] *See* Exhibit 1, Price Dep., pp. 23-24, 83; Exhibit 2, Barnes Dec., p. 1, ¶ 3.

Abandonment's well-site supervisor supervised Barnes.[36] Abandonment required Barnes to create and maintain files, working papers, and records related to his job duties.[37] Abandonment had the authority to terminate the working relationship with Barnes.[38] Abandonment controlled which customer to which Barnes would be assigned.[39] Abandonment decided how much Barnes would be paid.[40] Abandonment controlled how often Barnes would be paid.[41] Abandonment decided the method by which Barnes would be paid.[42] Abandonment was responsible for paying Barnes.[43] Abandonment required Barnes to complete and submit time sheets twice per month.[44] Moreover, after being assigned by Abandonment, Abandonment did not allow Barnes to work for any other offshore companies,[45] and Barnes needed to seek permission from Abandonment to leave the worksite.[46] Abandonment required Barnes be paid a day-rate.[47]

Where a putative employer controls the meaningful economic aspects of the business model, the control factor weighs in favor of a finding of employer status. *See Hopkins*, 545 F.3d at 343-44. Abandonment controls the placement of employees at a job site. Generally, an Abandonment sales representative engages potential customers and, after being informed of an upcoming job, recommends workers to customers for assignment.[48] As such, Barnes had no control over receiving potential leads regarding assignments, or the location of potential placements. Where a putative employer controls the number of leads distributed to its

---

[36] *See* Exhibit 1, Price Dep., p. 18, 51 (" . . . in charge of managing the different contractors on location . . . "; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[37] *See* Exhibit 1, Price Dep., p. 80; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[38] *See* Exhibit 1, Price Dep., p. 27; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[39] *See* Exhibit 1, Price Dep., p. 27; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[40] *See* Exhibit 1, Price Dep., p. 28; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[41] *See* Exhibit 1, Price Dep., p. 28; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[42] *See* Exhibit 1, Price Dep., pp. 28-29; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[43] *See* Exhibit 1, Price Dep., pp. 59-60; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[44] *See* Exhibit 1, Price Dep., pp. 60, 77; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[45] *See* Exhibit 1, Price Dep., p. 82; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[46] *See* Exhibit 1, Price Dep., p. 62; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[47] *See* Exhibit 1, Price Dep., pp. 28-29, 47.
[48] *See* Exhibit 1, Price Dep., pp. 60-61.

employees, and the geographic location of those leads, the putative employees "cannot plausibly

be considered separate economic entit[ies]." *Id.* at 344 (internal quotations omitted) (alteration in

original); *see also Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1991) ("Several

facts weigh in favor of employee status; for example, Sunland dictated the Welders' schedule . . .

Sunland assigned the Welders to specific work crews; Sunland paid the Welders an hourly rate

that was rarely negotiable . . .).

Abandonment argues at length that Barnes was expected to work, and did work, with no

day-to-day supervision, and that this should result in a finding of no control.[49] However, this

statement is incorrect both factually and legally. First, a well-site supervisor placed by

Abandonment supervised Barnes on a daily basis.[50] Abandonment paid the well-site supervisor

who oversaw the day-to-day activities assigned the well-site supervisor to the rig.[51]

Abandonment's president, Carroll Price ("Price"), admitted Abandonment well-site supervisors,

were ". . . in charge of managing the different contractors on location," and "responsible for the

actual conduction of the work and the project outcome, setting the pace on location . . . ."[52] As

such, Barnes *was* supervised on a day-to-day basis by an individual, who, like Barnes, was hired,

assigned, and paid by Abandonment.

Additionally, Barnes regularly worked from approximately 4:30 a.m. to 6:30 p.m., which

were the same hours kept by the Abandonment well-site supervisor, who required he be there

during those hours.[53] Where the evidence suggests a putative employee does not control the

hours worked, and that the employee is expected to work the hours requested by the putative

---

[49] *See* Document 21-1, pp. 13-14.
[50] *See* Exhibit 1, Price Dep., p. 18, 51.
[51] *See* Exhibit 1, Price Dep., p. 18.
[52] *See* Exhibit 1, Price Dep., p. 51.
[53] *See* Exhibit 3, Barnes Dep., p. 55. "Exhibit 3, Barnes Dep., p. [#]" shall refer to the page number of the deposition of Richard Barnes, attached hereto as Exhibit 3.

employer, this Court has found the scales of control tip in favor of a finding of employee status. *Karna v. BP Corp. N. Am., Inc.*, No. H-12-0101, 2013 WL 1155485, at *8 (S.D. Tex. March 19, 2013) (J. Ellison).

Abandonment claims Barnes admitted "that he did not require or receive hands-on and/or day-to-day supervision."[54] However, the deposition page cited by Abandonment merely states Barnes did not have any day-to-day *contact* with anyone at Abandonment's offices.[55] Abandonment ignores the fact that the well-site supervisor, who was provided by Abandonment, was in charge of the "independent contractors" on the rig, and provided the day-to-day supervision of Barnes.[56]

To the extent Abandonment argues Barnes and the well-site supervisors were subject to the control of its customer, Apache, its argument fails. Pursuant to the *Master Service Contract* ("MSA") entered into between Abandonment and Apache, " . . . neither [Abandonment] nor [any of its workers] shall be deemed to be subject to the control or direction of [Apache] as to the details of the Work."[57] The MSA contemplates that Apache will not control Barnes. Abandonment placed a supervisor on the rig who supervised Barnes. Abandonment exercised control over Barnes.

Finally, there is no suggestion that Barnes controlled any "meaningful economic aspects of the business." *See Hopkins*, 545 F.3d at 343-44 (finding control factor weighed in favor of employee status where sales leaders did not control personnel issues, advertising, products sold, or sales leads); *Chapman v. A.S.U.I. Healthcare of Tex., Inc.*, No. H-11-3025, 2012 WL

---

[54] *See* Document 21-1, p. 15.
[55] *See* Exhibit 3, Barnes Dep., p. 61.
[56] *See* Exhibit 1, Price Dep., p. 18.
[57] *See* Exhibit 1, Price Dep. Exh. 1, p. 2, ¶ 7. "Exhibit 1, Price Dep. Exh. 1, p. [#], ¶ [#]" shall refer to the page and paragraph number of the Master *Service Agreement*, attached as Exhibit 1 to the deposition of Carroll Price and attached hereto as part of Exhibit 1.

3614187, at *4 (S.D. Tex. Aug. 21, 2012) (finding control weighed in favor of employee status where defendant controlled all meaningful aspects of business, such as selecting clients, selecting residences, and hiring staff, and plaintiffs were merely assigned to houses and shifts). Abandonment controlled the selection of clients for whom Barnes worked and the location where Barnes was assigned, leaving Barnes with effectively no input into other business decisions affecting his work. *See Karna v. BP Corp. N. Am., Inc.*, 2013 WL 1155485, at *8-9 (J. Ellison).

Further, even if Abandonment had not supervised Barnes with regard to his day-to-day tasks—and as shown above, it did—such a claim "cannot be bootstrapped into an appearance of real independence." *Hopkins*, 545 F.3d at 343. In *Hopkins*, the defendant argued, like Abandonment does here, that the plaintiff had independence in his day-to-day affairs and that the defendant allegedly exercised little control beyond the requirements of the industry. *See id.* However, the Fifth Circuit concluded the control factor still weighed in favor of a finding of an employment relationship because the defendant controlled the meaningful aspects of the business model. *Id.*

Abandonment relies heavily upon *Thibault v. Bellsouth Telecommunications, Inc.* in support of its argument the control factor weighs against a finding of an employment relationship. However, in addressing a similar argument from a defendant in *Karna*, this Court previously stated,

> *Thibault* concededly discusses the defendant's control over the day-to-day aspects of how plaintiff performed his tasks as a splicer. However, *Thibault* merely lists out all of the facts that bear on each factor; it is entirely unclear which of those facts, or even which factors, the *Thibault* Court relied on for its ultimate conclusion that the district court's finding of independent contractor status should be affirmed.

*Karna*, 2013 WL 1155485, at *9 (J. Ellison).

-12-

Accordingly, the first factor of the economic realities test, degree of control, weighs in favor of a finding that Abandonment was Barnes's employer.

2.    Relative Investment

The relative investment of Barnes versus that of Abandonment weighs in favor of employee status. In applying the relative investment analysis, courts are to compare each individual worker's investment to that of the employer. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008). Here, Barnes had almost no investment relative to that of Abandonment as he did not supply his own office, desk, chairs, supplies, or equipment.[58] Barnes also did not supply the software necessary to perform his job as a Rig Clerk.[59]

Abandonment claims Barnes's investment consisted of travel to Louisiana, the acquisition of insurance, and the providing of equipment.[60] In support for its claim regarding travel costs, Abandonment cites to *Carrell v. Sunland Construction, Inc.* and *Thibault v. Bellsouth Telecommunications, Inc.*[61] Neither *Carrell* nor *Thibault* stand for the proposition that travel costs to the job site are to be included in analyzing the relative investment factor, but instead specifically reference lodging. In *Thibault*, the Fifth Circuit noted, "Thibault had his own motor home, *which he brought to Louisiana to live in.*" *Thibault v. Bellsouth Telecomms, Inc.*, 612 F.3d 843, 848 (5th Cir. 2010) (emphasis added). Similarly, in *Carrell*, the Court noted that the welders "provided their own lodging . . . " *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993). Accordingly, the cost incurred for Barnes to travel to Louisiana should not be considered, as the "relative investment" factor is restricted to the investment in the "specific job the employee undertakes." *Thibault*, 612 F.3d at 847. In any event, Abandonment ignores the

---

[58] *See* Exhibit 1, Price Dep., p. 37-39; Exhibit 2, Barnes Dec., p. 2, ¶ 4.
[59] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 4.
[60] *See* Document 21-1, pp. 19-20.
[61] *See* Document 21-1, pp. 19-20.

fact that Barnes was reimbursed one thousand, four hundred thirteen dollars ($1,413) for his travel expenses.[62] Even were travel expenses to be considered as part of Barnes's "relative investment," that amount is negligible, as a result of Abandonment covering most of the cost.

Abandonment also argues Barnes was required to maintain professional liability insurance coverage, which was a "significant investment."[63] However, Barnes never obtained such insurance, and therefore has no investment relative to that of Abandonment.[64] Further, even had Barnes purchased liability insurance, and he did not, any investment made by Barnes would be more than offset by the amount of investment made by Abandonment pursuant to the MSA between Abandonment and Apache.[65] Within the MSA, Abandonment covenants to carry, at its own expense, workers' compensation and employer's liability insurance, commercial general liability insurance, hull and machinery insurance, standard protection and indemnity insurance, excel liability insurance, and aircraft liability insurance.[66] It stands to reason that the expense incurred by Abandonment to obtain and maintain six forms of insurance for offshore projects would be equal to, and almost certainly dwarf, any expenses incurred by an individual to obtain liability coverage.

Finally, Abandonment contends that Barnes provided his own cell phone, laptop computer, software, postage, and safety equipment, and that this constitutes an investment by Barnes.[67] However, Barnes did not provide his own software, he did not have an investment in postage (he e-mailed his timesheets to Abandonment), nor did he invest in safety equipment.[68]

---

[62] *See* Exhibit 1, Price Dep. Exh. 2. "Exhibit 1, Price Dep. Exh. 2" shall refer to documents attached as Exhibit 2 to the deposition of Carroll Price, and attached hereto as Exhibit 1.
[63] *See* 21-1, pp. 1-2.
[64] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 7.
[65] *See* Exhibit 1, Price Dep. Exh. 1.
[66] *See* Exhibit 1, Price Dep. Exh. 1, pp. 37, 43-44.
[67] *See* Document 21-1, p. 20.
[68] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 4.

Moreover, as Price admitted, cell phones would have been little use offshore, as "it normally doesn't work."[69] Further, Abandonment reimbursed its workers for using their own laptop and cell phones, which is the functional equivalent of providing them.[70] In any event, Barnes did not incur these expenses out of his own pocket for his employment with Abandonment.[71]

During the time Barnes was an employee of Abandonment, Abandonment maintained a corporate office and employed the following: Carroll Price, President; Jeff Fulks, project manager; Vicki Torfin, accounting and office management; Ken James, petroleum engineer; and Amy Lyons, salesperson.[72] Similar factors have previously been found to result in a finding of an employment relationship. *See Carrell*, 998 F.2d at 344.

The "relative investment" factor weighs in favor of an employment relationship, as Barnes's individual investment in the business scheme is significantly less than that of Abandonment. *See Hopkins*, 545 F.3d at 344.

3.   Opportunity for Profit or Loss

Third, the opportunity for a profit or loss is controlled by Abandonment, not by Barnes. In applying this factor, courts consider whether the putative employee or employer controlled the major determinants of the amount of profit the worker can make. *See Hopkins*, 545 F.3d at 344. In other cases where the Fifth Circuit has found a worker's opportunities for profit and loss result in a finding of independent contractor status, "the worker typically could control how much he earned from working for the defendant." *Karna v. BP Corp. N. Am., Inc.*, No. H-12-0101, 2013 WL 1155485, at *10 (S.D. Tex. March 19, 2013) (J. Ellison) (collecting cases).

---

[69] *See* Exhibit 1, Price Dep., p. 40.
[70] *See* Exhibit 1, Price Dep. Exh. 2; Exhibit 1, Price Dep., pp. 39-40.
[71] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 4.
[72] *See* Exhibit 1, Price Dep., pp. 9-11.

As mentioned above, Abandonment did not permit Barnes to assign or delegate his job duties,[73] and Abandonment controlled the amount, frequency, and method by which Barnes would be paid.[74] Barnes was not allowed to work for any other offshore companies after being assigned by Abandonment.[75] Further, the day-rate paid to Barnes was not presented to Barnes as being negotiable.[76]

Abandonment argues Barnes controlled the amount of his profit or loss because he could accept or find additional work. In support, Abandonment cites to *Mack v. Talasek*, an unreported memorandum opinion and order from the Southern District of Texas—Victoria Division.[77] In *Mack*, the Court stated workers could have increased their overall profits by working more, either by taking additional jobs with the employer, or by taking jobs with other general contractors. *See Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *4 (S.D. Tex. March 28, 2012). However, the court in *Mack* held this factor weighed against a finding of employment because the plaintiffs "did not work a required schedule that precluded extra work." *Id.* Here, Barnes's schedule was not temporary and sporadic in nature, as Barnes worked a set schedule of fourteen days on and fourteen days off.[78] Because every hitch consists of fourteen days on followed by fourteen days off, it would not be possible for Barnes to accept other Rig Clerk positions with Abandonment or any other employer; the work schedules would almost certainly overlap, conflict, or be at a separate location. Consequently, in this industry a Rig Clerk can only work for one company at a time.[79]

---

[73] *See* Exhibit 1, Price Dep., pp. 24, 83; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[74] *See* Exhibit 1, Price Dep., pp. 28-29; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[75] *See* Exhibit 1, Price Dep., p. 82; Exhibit 2, Barnes Dec., p. 1, ¶ 3.
[76] *See* Exhibit 1, Price Dep., p. 28; Exhibit 2, Barnes Dec., p. 3, ¶ 8.
[77] *See* Document 21-1, p. 22.
[78] Exhibit 2, Barnes Dec., p. 3, ¶ 8.
[79] Exhibit 2, Barnes Dec., p. 3, ¶ 8.

Unlike someone truly in business for himself, Barnes was not in a position to do anything to increase his profits. As recognized by Abandonment's corporate representative, there was not any way for Barnes to reduce the cost of performing his services as a Rig Clerk and thus net himself more money.[80] Barnes's earnings were entirely dependent upon, and in fact was equivalent to, the wage paid to him by Abandonment.

In any event, as the Fifth Circuit has previously stated, "is it not what the [employee] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987) (emphasis in original). Here, what Barnes actually did was work exclusively for Abandonment. It was not possible for Barnes to secure additional employment as a Rig Clerk while either out on a rig or on shore, and Barnes was not able to work smarter, harder, or otherwise cut costs to increase his profits. Were Abandonment's position adopted by courts, then this factor could *never* result in a finding of employment relationship, as an argument could always be made that an individual could find a second job at nights, sell antiques on eBay during a lunch break, or mow lawns on weekends. Such a result surely is not within the FLSA's expansive definition of "employee."

Because Barnes could not control how much he earned from working for Abandonment, the amount of profit Barnes was able to make weighs in favor of a finding of an employment relationship. *See Karna*, 2013 WL 1155485, at *10-11.

4.    Skill and Initiative Required

The fourth factor is whether the worker exhibits the type of skill and initiative typically indicative of independent contractor status. *Hopkins*, 545 F.3d at 345. Generally, courts within the Fifth Circuit look for a unique skill set, or an ability to exercise significant initiative within the business. *Id.*

---

[80] *See* Exhibit 1, Price Dep., pp. 34-35.

The skill and initiative for performing the job of a Rig Clerk is minimal. Barnes's position of a Rig Clerk consisted of performing job duties that were essentially clerical in nature.[81] Barnes's general job duties were to answer phones, track the logistics of Abandonment, help with the communication process, and coordinate the subcontractors and third-party contractors offshore.[82]

In his declaration submitted in support of Abandonment's MSJ, Abandonment's President, Carroll Price, swore that Barnes's job duties as a Rig Clerk "were far more than mere clerical work."[83] Price then goes on to list ten duties that ostensibly support his contention.[84] Price's declaration testimony directly controverts his previous deposition testimony, and should be disregarded as a sham declaration. In any event, Price's declaration is contradicted by his previous deposition testimony and by Barnes's declaration. In his deposition, taken February 21, 2013, Price testified as follows:

> Q:    Do you know what a rig clerk typically does?
> A:    Yeah
> Q:    What?
> A:    Answers phones, tracks the logistics, helps with the communication process, coordinated subcontractors and third party contractors offshore.
> Q:    Is it a clerical-type job?
> A:    It's a clerical position, the majority of it.[85]

In its MSJ, Abandonment cheekily states: "While Barnes' [sic] counsel and Barnes might have referred to the duties of Rig Clerks as clerical in nature, Barnes and the other alleged similarly

---

[81] *See* Exhibit 1, Price Dep., pp. 44-45; Exhibit 2, Barnes Dec., p. 2, ¶ 5.
[82] *See* Exhibit 1, Price Dep., pp. 49-52; Exhibit 2, Barnes Dec., p. 2, ¶ 5.
[83] *See* Document 21-4, p. 1, ¶ 4.
[84] *See* Document 21-4, p. 2, ¶ 4.
[85] *See* Exhibit 1, Price Dep., pp. 44-45.

situated Rig Clerks in this case, [sic] were actually responsible for running their own consulting business, which required skill and initiative."[86] Abandonment fails to mention that its president also "might have referred to the duties of Rig Clerks as clerical in nature," and in fact did.

In contradiction to his deposition testimony, the job duties Price lists as being "far more than mere clerical work" indicate precisely the opposite. In his declaration in support of Abandonment's MSJ, Price lists the job duties of a Rig Clerk to be (1) coordinating logistics; (2) communicating with the customer and contractors; (3) communicating with shore base facility; (4) adhering to applicable requirements and laws; (5) gathering daily charges; (6) maintaining inventory and receiving paperwork; (7) preparing paperwork; (8) interacting with employees, contractors, and vendors; (9) handling "special projects"; and (10) do so without direction or supervision.[87] First, as shown above, Barnes was not expected to work without direction or supervision; he was supervised by a worker placed and paid by Abandonment. Moreover, each of the ten duties listed above are essentially clerical in nature, and none involve any special skill.[88] "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998). Even were some of these duties considered "special skills," the use of special skills is not indicative of independent contractor status where the worker does not use the skills in any independent way. *See Karna*, 2013 WL 1155485, at *10-11 (J. Ellison) (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998)).

Further, Barnes had little to no opportunity to exercise initiative within the business, as Barnes was not free to delegate or assign his job duties to anyone else.[89]

---

[86] *See* Document 21-1, p. 17.
[87] *See* Document 21-4, p. 2, ¶ 4.
[88] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 5.
[89] *See* Exhibit 2, Barnes Dec., p. 1, ¶ 3.

Therefore, this factor weighs in favor of a finding of an employment relationship. *See Hopkins*, 545 F.3d at 345; *Karna v.* 2013 WL 1155485, at *12 (a unique skill set does not require finding independent contractor status).

5.      Permanency of the Relationship

Finally, the permanency of the relationship weighs in favor of a finding of employment, or at the least is a neutral factor. Among the considerations regarding permanency, courts consider the length of the relationship between the parties and whether the worker provides similar services to other companies during the time in question. *See Karna*, 2013 WL 1155485, at *12.

Over the past three years, Abandonment has assigned a total of forty-five to fifty workers to oilfield companies, of which approximately thirty are assigned at any given time.[90] As recognized by Abandonment's president, Price, Abandonment does not experience a lot of turnover with its workers.[91] Also, while employed by Abandonment, Barnes did not provide services for any other companies.[92] The position of Rig Clerk was an integral part of Abandonment's business, and if Barnes were not performing the work, another employee would have been required to do so.[93] Performing work integral to the business that is of "relative permanence" weighs in favor of a finding of an employment relationship. *See Shultz v. Hinojosa*, 432 F.2d 259, 264-65 (5th Cir. 1970).

---

[90] *See* Exhibit 1, Price Dep., p. 44.
[91] *See* Exhibit 1, Price Dep., p. 50.
[92] Exhibit 2, Barnes Dec., p. 2, ¶ 5.
[93] *See* Exhibit 1, Price Dep., p. 45.

Abandonment consistently refers to the duration of Barnes's employment with Abandonment to be "approximately forty (40) days."[94] However, Barnes worked at Abandonment from approximately July 1, 2011, through September 15, 2011, nearly twice as long as represented by Abandonment.[95]

Even were Abandonment correct in its assertions that Rig Clerks travel from job-to-job and place-to-place, where workers tend to be itinerant, courts must focus on the nature of their dependence instead of their permanence. *See Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995). If the liberties given to a worker merely mask economic reality, and the totality of the circumstances indicate economic dependence, a finding of lack of permanency will weigh in favor of a finding of an employment relationship. *Id.*

6.    Written Agreement

In considering additional factors, Abandonment argues Barnes's signature on an *Independent Contractor Master Agreement* should militate against a finding of employment. However, as stated by the Supreme Court just last month, the minimum wage, maximum hour, and overtime guarantees of the FLSA cannot be modified by contract. *Genesis Healthcare Corp. v. Symczyk*, No. 11-1059, ___ S. Ct. ___, 2013 WL 1567370, at *3 (April 16, 2013). As the Fifth Circuit has also held, "subjective beliefs cannot transmogrify objective economic realities. A person's subjective opinion that he is a businessman rather than an employee does not change his status." *Hopkins*, 545 F.3d at 346 (quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987) (citations and internal quotations omitted)).

---

[94] *See* Document 21-1, p. 10.
[95] *See* Exhibit 1, Price Dep. Exh. 2.

It is not clear that Abandonment contracted with KAL Logistics. The contract identifies "Richard L. Barnes" as the contracting party on the first page and signature page, and identifies KAL Logistics as the address for any notice to Barnes.[96] It hardly matters though because KAL logistics is merely an assumed name Barnes created, and which he never incorporated or registered. Barnes created the assumed name because it was required of him by the hiring party.[97] Whether Mr. Barnes signed the *Independent Contractor Master Agreement* in his own name, or in the name of KAL Logistics, is of no import, as "A person's subjective opinion that he is a businessman rather than an employee does not change his status. [F]acile labels . . . are only relevant to the extent that they mirror economic reality." *Karna*, 2013 WL 1155485, at *13 (J. Ellison). Moreover, in its internal

7.   <u>Industry Custom</u>

As stated by Abandonment in its MSJ, case law is sparse regarding the consideration of industry custom in the context of the economic realities test.[98] However, as recognized by the Second Circuit, when considering the economic realities of potential employers,

> . . . historical practice may also be relevant, because, if plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may, in particular circumstances, be attributable to widespread evasion of labor laws.

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 73-74 (2d Cir. 2003).

---

[96] Exhibit 1, Price Dep. Exh. 4, pp. 1, 4.
[97] Exhibit 2, Barnes Dec., p. 3, ¶ 9.
[98] *See* Document 21-1, p. 24.

This is precisely what is happening here. The drilling companies do not want to pay overtime to the workers on rigs because of the long and often uncertain hours they have to work. So, the drilling companies hire workers through staffing firms and pay the staffing firms a day-rate for the workers in exchange for the staffing firm taking responsibility for paying the worker in accordance with the law.[99] Where, as is the case here, the staffing firm attempts to skirt its responsibility by misclassifying the worker as well, the worker suffers loss, the purposes of the FLSA are undermined, and the rights of subsequent workers are eroded as well.

The Supreme Court has made clear that the FLSA is a remedial statute that must be interpreted broadly. *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698 (1944). To find independent contractor status in these situations is to encourage businesses to simply have their would-be employees sign an agreement as a condition of their hire, thus stripping them of many of their employment rights.

Barnes has presented evidence that he was an employee of Abandonment. Barnes has presented evidence he was, as an economic reality, economically dependent upon Abandonment.

**B.     Barnes is Owed for Overtime under the FLSA**

Because Barnes is, as an economic reality, an employee of Abandonment under the FLSA, Barnes is owed for overtime under the FLSA. The FLSA imposes maximum work hour standards and requires employers to compensate employees who work overtime at one and one-half times their regular hourly rate. *See* 29 U.S.C. § 207. Employees who are classified as

---

[99] *See* Exhibit 1, Price Dep. Exh. 1, p. 1, § 3 ("Contractor shall be solely liable for any deficiency in its contracts with its subcontractors, agents and representative . . ."), p. 2, § 7 ("Contractor shall be, and perform at all times as, an independent contractor, and neither Contractor nor any member of Contractor Groups shall be deemed to be subject to the control or direction of Company as to the details of the Work."), p. 2, § 8 (". . . Company shall have no right to terminate or affect any other term or condition of employment of any member of Contractor Group . . . "), p. 3, § 10(c) ("Contractor shall further pay . . . all taxes . . . incident to the Work by any governmental authority, including without limitation, unemployment compensation insurance, old age benefits, social security, or any other assessments or taxes upon wages of Contractor or any member of Contractor Group.").

exempt are not entitled to such compensation. 29 U.S.C. § 213.  Exemptions to the FLSA are construed narrowly against the employer and the employer has the burden of proving that an employee is exempt. *Auer v. Robbins*, 519 U.S. 452, 462, 117 S. Ct. 905, 912 (1997); *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002).

When an employee is paid a day-rate, he is entitled to extra half-time pay at his regular rate for all hours worked in excess of forty in the workweek. 29 C.F.R. § 778.112. Barnes worked well in excess of forty hours per week.[100] Barnes was not paid extra half-time overtime for every hour he worked over forty in a workweek.[101] Barnes was paid a day-rate.[102] A day-rate does not meet the salary basis test of the FLSA, which is an integral part of any potentially applicable exemption. *See* 29 C.F.R. § 541.602.

Abandonment claims "This matter is one of three (3) frivolous FLSA collective actions filed by serial collective action Plaintiff, Richard Barnes . . . ."[103] However, Abandonment never offers any evidence as to the factual basis for the other cases or gives any evidence that they are frivolous. Abandonment only offers conclusions and unprofessional attacks on opposing counsel. Workers are naturally afraid to complain about misclassification and the violation of the FLSA by payment of a day-rate—which Abandonment makes no attempt to argue satisfies the FLSA's salary basis test for an exemption—because the workers naturally do not want to be blacklisted in the industry. Barnes is no longer subject to such fears. Barnes is seventy-nine years old and is no longer in fear of retaliation. That he has had the courage to assert his rights under the FLSA against other employers who have violated the law, if relevant at all to the claims in this case, should be affirmed, not ridiculed.

---

[100] *See* Exhibit 2, Barnes Dec., p. 2, ¶ 5; Exhibit 3, Barnes Dep., p. 61.
[101] *See* Exhibit 1, Price Dep., p. 50.
[102] *See* Exhibit 1, Price Dep., p. 50.
[103] *See* Document 22, p. vii.

## VI. Conclusion

Barnes has presented evidence sufficient to preclude summary judgment. He has presented evidence on which a jury could conclude he was an employee of Abandonment for the purposes of the FLSA. Barnes requests that Abandonment's motion for summary judgment be denied.

### Prayer

WHEREFORE, Plaintiff, Richard Barnes, prays Defendant, Abandonment Consulting Services, L.L.C.'s motion for summary judgment be denied; and that Plaintiff receive such other and further relief, in law and in equity, to which he and such other plaintiffs may be justly entitled.

Respectfully submitted,

LAW OFFICE OF G. SCOTT FIDDLER, P.C.

**/S/ G. Scott Fiddler**
_____
G. SCOTT FIDDLER
SBOT #06957750
FID #12508
scott@fiddlerlaw.com
ANDREW W. REED
SBOT #24074935
FID #1140192
areed@fiddlerlaw.com
9601 Jones Road, Suite 250
Houston, Texas 77065
Tel.:   281-897-0070
Fax:    281-897-0078

ATTORNEYS-IN-CHARGE
FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document and proposed Order will be accomplished through the notice of electronic filing in accordance with the Federal Rules of Civil Procedure on this the 28th day of May 2013, to the following:

Jerry Redmond Jr., Esq.
Redmond Legal Group
2011 Windsor Street
Houston, Texas 77006
JRedmond@RedmondLegalGroup.com

/s/ **G. Scott Fiddler**

_____

G. SCOTT FIDDLER