UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD BARNES, | § § § | |
| *Plaintiff(s)*, | § § | CIVIL ACTION NO. 4:12-CV-01399 |
| v. | § § | |
| ABANDONMENT CONSULTING SERVICES, L.L.C., | § § § § | |
| *Defendant.* | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Plaintiff Richard Barnes's ("Barnes") Motion to Conditionally Certify a Collective Action and to Issue Notice. (Dkt. 20). This case has been referred to this Court pursuant to 28 U.S.C. § 636 (b)(1)(B). (Dkt. 25). Having considered the parties' briefing, argument, the applicable legal authorities, and all matters of record, the Court recommends that Barnes's Certification Motion be **DENIED**.

### BACKGROUND

Barnes is a 79-year-old Michigan resident. For the past fifteen years, he has worked as a "Logistics Coordinator, Safety Rep, Rig Dispatcher, and Rig Clerk" on various oil rigs in the Gulf of Mexico. (Dkt. 29-2 at 3). Barnes is also the owner of KAL Logistics, a company that he describes as a "self-employment company." (Dkt. 21).

Abandonment Consulting Services ("ACS") is oil and gas staffing firm that provides contract personnel for well plugging and abandonment projects. (Dkt. 22-3, ¶

2). On July 7, 2011, Barnes and ACS entered into an "Independent Contractor Master Agreement" (the "Agreement"). Barnes signed the Agreement as the "owner" of "KAL Logistics," and provided the company's EIN number for processing his payments instead of his own social security number. Barnes was assigned by ACS to work for Apache Corporation as a Rig Clerk for three 14-day periods. (Dkt. 20-3 at 57–61; Dkt. 22-3, ¶ 3). Apache paid ACS for each day that Barnes worked or was available to work on its rig. Apache paid a "Full Day Rate" of $450 and a "Standby Day Rate" of $225. (Dkt. 22-7 at 41). ACS then paid Barnes 80% of these amounts. (Dkt. 26-2 at 8). To work for these three periods, Barnes traveled from his home in Michigan to the "meet-up" point in Louisiana. ACS, whom Apache then reimbursed, paid for Barnes's travel to and from the offshore rig in the Gulf of Mexico. Between July 21, 2011 and September 12, 2011, Barnes was paid for 30 full days and 2 standby days, and compensated for 1,820 miles of travel (Dkt. 26-3 at 18–35).

## PROCEDURAL HISTORY

On May 3, 2012, Barnes filed this lawsuit against ACS, alleging that ACS was his employer and violated sections of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA").[1] Barnes alleges he should have been classified as an "employee" of ACS, and that ACS willfully violated the FLSA by failing to pay him (and other similarly situated

---

[1] In the past year, Barnes has filed four similar lawsuits against other past employers in this Court. In each of these suits, Barnes alleges violations of the FLSA or the Age Discrimination in Employment Act ("ADEA"), and each time he seeks to have his case certified as a collective action. *See* Nos. 4:12-cv-01132; 4:12-cv-01397; 4:12-cv-01399. This Court, *sua sponte*, takes judicial notice of the pleadings in these cases.

2

Rig Clerks) the overtime pay required by statute. ( Dkt. 1, ¶ ¶ 6.1, 6.5). Barnes alleges that ACS's classification of Rig Clerks as independent contractors instead of employees is a "common practice or policy" that ACS uses to avoid paying payroll taxes and overtime premiums. (Dkt. 20 at 6–7). Barnes's Complaint alleges that he asserts these claims "on his own behalf and on behalf of other employee/workers and former employee/workers of ACS who were paid the day rate at any time from May 3, 2009, to the present." (Dkt. 1 ,¶ 2.1).

In July 2012, United States District Court Judge Keith Ellison issued a Docket Control Order, setting the deadline for amended pleadings as February 1, 2013, the discovery cut-off date as April 5, 2013, and assigning an August 5, 2013 trial date. In August 2012, Barnes filed his initial disclosures under Federal Rule of Civil Procedure 26(a). Barnes listed only himself, his attorney, a retained expert and one co-worker, as persons with knowledge of relevant facts.

On April 25, 2013—almost a full year after he filed his Complaint—Barnes filed a "Motion for Conditional Certification and Notice to Potential Plaintiffs." (Dkt. 20). In that Motion, Barnes alleges that he is owed overtime pay because he "regularly worked over forty hours per week . . . and . . . at least twelve hours every day." (Dkt. 20-4 at 3). He further insists that FLSA exemptions do not apply to his position because "[a] day-rate does not meet the salary basis test of the FLSA, which is an integral part of any potentially applicable exemption." (Dkt. 20 at 18). Barnes also alleges that "[b]ased on [his] experience and knowledge of the role and job duties of Rig Clerks, other workers assigned by Abandonment to work as Rig Clerk during the past three years would have

3

worked a similar number of hours." (Dkt. 20-4 at 3). Accordingly, Barnes seeks to have this case certified as a collective action.

Barnes's proposed class differs from the language of his Complaint and defines the proposed class as including all "persons employed by Abandonment Consulting, LLC as a Rig Clerk at any time between May 3, 2009, and the present." (Dkt. 20-6 at 2). Additionally, even though the discovery period in this case closed three months ago, Barnes also asks the Court to order ACS to provide, "within ten days," the full name, last known address, last known telephone number, and social security number or date of birth of all of its assigned Rig Clerks from May 1, 2009 through the current date. (Dkt. 20).

## ANALYSIS

### A. The FLSA allows collective actions to be brought on behalf of "similarly situated" workers.

Under the FLSA, an employee may file a lawsuit for unpaid overtime wages on behalf of himself as well as other "similarly situated employees" who "opt-in" to the suit. 29 U.S.C. § 216(b); *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 464 n.2 (S.D. Tex. 2012). The term "similarly situated" is not defined in the FLSA. *See, e.g.,* 29 U.S.C. §§ 203, 216. Courts in this District interpret "similarly situated" to mean an employee who is "affected by a common policy, plan, pattern, or practice" as the one at issue in the plaintiff's lawsuit. *McKnight v. D. Hous., Inc.*, 756 F. Supp. 2d 794, 803 (S.D. Tex. 2010).

> **B. In the Fifth Circuit, certification usually proceeds under the *Lusardi* approach—*i.e.,* it is undertaken early in the case and a plaintiff's allegations that 'similarly situated' workers exist and wish to opt-in to the suit are reviewed 'leniently.'**

Whether to certify a suit as a collective action under the FLSA is a decision committed to the discretion of the court. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995)(overruled on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90-91, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)). Courts in the Southern District of Texas generally use the *Lusardi* approach to determine whether a collective action is warranted. *See, e.g., Walker*, 870 F. Supp. 2d at 465 ("The Fifth Circuit has not determined which method is more appropriate, but most courts use the *Lusardi* approach, including this one.") (internal citations omitted); *see also Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).

The *Lusardi* analysis proceeds in two stages: (1) a "notice stage", followed by (2) a decertification stage. *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916 n. 2 (5th Cir. 2008)(citations omitted). The notice stage takes place early in the case, before the parties have a chance to conduct substantive discovery. *Blake v. Hewlett-Packard Co.*, No. 4:11-CV-592, 2013 WL 3753965, at *4 (S.D. Tex. July 11, 2013). In contrast, the decertification process occurs after the parties have had ample opportunity for discovery. *Id.* At the first stage, the court makes a preliminary determination whether there are any potential plaintiffs who may be similarly situated to the plaintiff in the pending lawsuit. *Mooney*, 54 F.3d at 1213-14. The plaintiff seeking conditional certification must present at least a "minimal showing" that "(1) there is a reasonable basis for crediting the

assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt-in to the lawsuit." *Walker*, 870 F. Supp. 2d at 465-66 (citations omitted). Because this analysis occurs before the discovery process, the burden on the lead plaintiff is "lenient and typically results in conditional certification." *See e.g., Walker*, 870 F.Supp.2d at 465. Courts often make the determination based on the pleadings and any available affidavits. *Id.*

The second stage of *Lusardi* occurs after discovery has taken place. Upon a defendant's motion to decertify, the trial court reviews the available evidence collected in discovery. *Id.* If the court finds that the evidence shows that the plaintiffs are not in fact "similarly situated" to the original lead plaintiff, then the class is decertified, the opt-in plaintiffs are dismissed, and the original plaintiff proceeds individually. *Id.*

### C. When a plaintiff moves for conditional certification *after* discovery, evidence of 'similarly situated' workers is reviewed under a stricter standard.

*Lusardi* presumes that the plaintiff moves for certification in early stages of the case. When a plaintiff instead waits until after the close of discovery to request certification, the "lenient" standard of the first step of *Lusardi* is no longer appropriate. *Blake*, 2013 WL3753965, at *4 (noting that, when parties have already conducted discovery, "the rationale for applying a limited, lenient inquiry at the notice stage loses its force.")(citation omitted). Instead, courts "consider the evidence submitted and the [*Lusardi*] two-step inquiry collapses into one." *Harris v. Fee Transp. Servs., Inc.*, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006); *Valcho v. Dall. Cnty. Hosp. Dist.*, 574 F.

Supp. 2d. 618, 622 (N.D. Tex. 2008) (finding "less cause for leniency" where a plaintiff had "already conducted discovery on the certification issue" and "hesitat[ing] to facilitate notice where a plaintiff . . .still cannot support her claim with evidence"). In this condensed approach, the plaintiff must meet a higher evidentiary standard in order prevent the imposition of an unfair burden upon defendants, and to prevent a "frivolous fishing expedition." *Valcho*, 574 F. Supp. 2d at 622.

In such instances, courts have not specified the precise quantity of evidence that a plaintiff must bring forth to support conditional certification. The amount is necessarily more than the "minimal" showing of a "reasonable basis for crediting [plaintiff's] assertion" that is acceptable in the normal course of a pre-discovery *Lusardi* analysis— courts have been clear that something more than the plaintiff's own allegations and declarations is required. *See, e.g., Blake*, 2013 WL 3753965, at *8 ("[B]ecause Plaintiffs have been allowed the opportunity to gather more than just 'minimal evidence,' they are required to support their motion with more than minimal evidence."). For example, in *Valcho*, where the parties had "the benefit of three months of discovery," the court determined it could "reasonably expect Valcho to be able to produce evidentiary support beyond the bare allegations contained in her complaint and personal declaration." 574 F. Supp. 2d at 622. Likewise, in *Harris*, the Court determined that seven months of completed discovery was "sufficient to engage the second step of the analysis" and justify imposing a higher burden upon a plaintiff seeking conditional certification. 2006 WL 1994586 at *3.

**D. Barnes seeks certification after the close of discovery and he presents only minimal evidence of 'similarly situated' workers who would opt-in to this lawsuit.**

As discussed above, Barnes's Complaint, in which he alleged that he would seek certification as a collective action, was filed on May 3, 2012. Although Judge Ellison's scheduling order stated that the discovery period would close on April 5, 2013 and set a trial date of August 5, 2013, Barnes did not to file his motion for conditional certification until April 25, 2013. The bulk of Barnes's motion for conditional certification is devoted to parsing the standard under *Lusardi* and contending that Barnes's designation as an independent contractor should not preclude certification in this case. Barnes's motion for conditional certification spends almost no time pointing this Court to evidence showing the number of other Rig Clerks who might exist, what their job descriptions might have been, and whether there is any credible evidence that they are likely to opt-in to this lawsuit.

It appears that, although the discovery period in this case lasted approximately a full calendar year, only two depositions were ever taken in this lawsuit---the deposition of Carrol Price, President of ACS, and the deposition of Barnes himself. In addition, Barnes has submitted his own affidavit. ACS also submitted the declaration of Carrol Price. The declaration of Vernon Bertrand, a supervisor who identifies as an independent contractor with ACS (although he has not supervised Barnes), is also in the record.

To establish that "other aggrieved individuals exist," Barnes points to Price's deposition testimony that ACS assigned approximately sixteen or seventeen workers to various Rig Clerk positions "in the past three years." (Dkt. 20, pg. 12). Elsewhere,

8

Barnes alleges that there are currently ten ACS workers assigned to Rig Clerk positions. (Dkt. 20, pg. 13).

To show that these individuals are "similarly situated", Barnes points to Price's testimony that it was common for ACS-assigned Rig Clerks to work more than 40 hours per week without being paid overtime. Although Barnes alleges that each of these Rig Clerks had the same job title and was paid the same daily rate, he does not point to any evidence showing that the job locations and descriptions for each of these Rig Clerks were similar to his own. Similarly, Barnes fails to bring forth evidence that any of his fellow ACS Rig Clerks were assigned to an Apache rig, as was he, or even that his fellow Rig Clerks were assigned to similar types of rigs or drilling operations, with schedules and work systems similar to the rig upon which he stationed.

In its Response, ACS contends that Barnes' motion for conditional certification is particularly problematic because Barnes, and other Rig Clerks and ACS workers, were self-acknowledged "independent contractors." ACS points out that the inquiry into whether a worker is an independent contractor or an employee is fact intensive and highly particularized. *See, e.g., Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013) (stating the "economic realities/common law control test . . . [determines] whether a party is an employee or an independent contractor").[2] However, due to the

---

[2] Factors include whether putative employees, "as a matter of economic reality, are dependent upon the business to which they render service," as well as (1) the kind of occupation and whether work is under the direction of a supervisor; (2) the skill required; (3) who furnishes equipment used and workplace; (4) the length of time the individual has worked; (5) whether payment is salaried or not; (6) the manner in which the work relationship is terminated; (7)

9

paucity of the evidence in this case, the Court need not undertake the unenviable task of determining whether Barnes and others like him were employees or independent contractors. Indeed, the Court need not even decide whether such an analysis should, in theory, be performed at this stage. In this case, there is zero evidence with which to begin the "similarly situated" analysis, much less take it to the next level of complexity by addressing the independent contractor issue.

Finally, and perhaps most crucially, Barnes cannot show that any Rig Clerks, even assuming they are "similarly situated," wish to opt-in to this lawsuit. The only evidence in the record, other than Barnes's own testimony is the declaration of Verlon Bertrand—who was a "supervisor," not a Rig Clerk. Mr. Bertrand's declaration is notable because he _expressly states_ he has "no intention of joining and/or opting into Mr. Barnes' pending collective action." (Dkt. 26-5 at 14, Dkt. 22-8 at 2). This evidence does not support certification.

Similarly, although he alleges that he "knows" they exist, Barnes has not identified any Rig Clerks who might opt-in by their name, location, or general description. Barnes's pleadings simply contend that he is aware that other similarly situated Rig Clerks exist, based on his "personal knowledge" and "conversations with [his] lawyer." However, this argument is insufficient—"[j]ust as one finds a variety of architectural styles in the average suburb, so one finds different types of oil rigs in the offshore

---

whether annual leave is afforded; (8) whether the work is an integral part of the employer's business; (9) any retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. _Juino,_ 717 F.3d at 434-35 (citations omitted).

neighborhood." *American Petroleum Institute v. E.P.A*, 661 F.2d 340, 343 (5th Cir. 1981) (noting, even thirty years ago, the numerosity of offshore facilities in the Gulf of Mexico, operating at a range of depths "from less than 100 feet to over 1000 feet," and that "[s]ome wells are within swimming distance while others are located as far as 100 miles from shore."). The Court takes judicial notice of the fact that the Gulf of Mexico is a large body of water, with varying underwater topography, upon which a wide variety of commercial activities related to the fossil fuels take place, and that offshore "rigs" are similarly diverse their in sizes, functions and purpose. *See also* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* § 3-9, 108 n. 8 (West 2d Ed.1994) (describing various categories types of rigs). Given the diversity and complexity of this industry, this is insufficient to justify class certification. *See, e.g., Blake,* 2013 WL 3753965, at *12 (denying motion for collective action where only one other worker had opted-in, "despite [Plaintiff's] repeated claims that he knows of and is familiar with other similarly situated employees, both in Houston and at other locations."); *see also Carey v. 24 Hour Fitness*, No. H–10–3009, 2012 WL 4857562, at *3 (S.D. Tex. Oct. 11, 2012) ("The Court concludes that typically a showing is necessary that at least a few similarly situated individuals seek to join the lawsuit. Other employees' interest in joining the litigation is relevant to deciding whether or not to put a defendant employer to the expense and effort of notice to a conditionally certified class of claimants in a collective action.").

### E. Conditional certification in this case would not promote judicial efficiency.

Finally, the Court addresses Barnes's contention that these fellow Rig Clerks do exist, and do desire to opt-in, but that perhaps they have not come forward due to the fact

11

that "[w]orkers are naturally afraid to complain about misclassification and . . . violation[s] of the FLSA . . . because the workers naturally do not want to be blackballed in the industry." (Dkt. 24 at 5). Barnes argues, "requiring evidence of purported class members who are willing to opt-in . . . places the proverbial cart before the horse, and would necessitate plaintiffs and attorneys sending informal notice to potential opt-ins or otherwise solicit potential plaintiffs." (Dkt. 24 at 3). However, this is the very reason *Lusardi* contemplates filing a motion for conditional certification at the onset of the litigation and using the discovery process and notice power of the court to aid a plaintiff's search for fellow workers who were "similarly situated." However, some initiative must still be shown by a plaintiff in Barnes' position—either moving for conditional certification under *Lusardi* at the onset of a case, or using the basic tools of discovery to glean facts from the employer about the number and circumstances of fellow workers and then moving for certification during or after discovery. In this case, Barnes did neither.

Significantly, Barnes has failed to point this Court to any case allowing conditional class certification under the circumstances presented here. Barnes's approach, mere weeks before trial, curtails rather than promotes judicial efficiency. Even if this Court were to recommend conditional certification, it is not implausible that Barnes's suit would be resolved before any of hypothetical claimants opt-in, thus rendering Barnes' collective action moot. *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529 (2013)("In the absence of any claimant's opting in, respondent's suit became moot when her individual claim became moot, because she lacked any personal interest in representing others in this action."). Even if Barnes could locate

additional plaintiffs who wished to opt-in to a collective action, the discovery deadline has long since passed. ACS should not be penalized because Barnes failed to use the many tools within his reach.

## CONCLUSION

The Court has considered Barnes's Motion for Conditional Certification, all responses, objections, and the applicable law. In light of the record, the pleadings, and the relevant case law, the Court recommends that the motion should be **DENIED.**

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.

Signed at Houston, Texas on July 26, 2013.

_____
GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE